**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

GLENDA L. MAYNARD,

           Plaintiff,

v.

OLD DOMINION UNIVERSITY,

           Defendant.

**Civil Action No. _____**

**TRIAL BY JURY DEMANDED**

## **COMPLAINT**

Plaintiff, Glenda L. Maynard ("Ms. Maynard" or "Plaintiff"), by counsel, respectfully submits this Complaint against her former employer, Old Dominion University ("ODU"). Ms. Maynard asserts claims for racial discrimination and retaliation pursuant to 42 U.S.C. §2000(e) (Title VII), as well as claims for racial discrimination and retaliation in the making and enforcement of Plaintiff's employment contract pursuant to 42 U.S.C. § 1981.

## **JURISDICTION AND VENUE**

1. This is a civil action arising under the laws of the United States. This court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. Venue is proper in this district court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events giving rise to the claims asserted herein occurred in the Eastern District of Virginia.

## PARTIES

3. Ms. Maynard is a resident of Chesapeake, Virginia, and has resided there during the events giving rise to this action.

4. ODU is a state-supported university located in Norfolk, Virginia.

## FACTS

5. Ms. Maynard is a Black woman, 49 years of age during the event giving rise to this action, and a 1992 graduate of Georgetown University with a bachelor's degree in English, and a 1995 graduate of New York University with a Master's of Public Administration, Public Finance and Financial Management.

6. Ms. Maynard accepted a Notice of Appointment dated August 28, 2012, effective as of September 10, 2012, as a Major Gift Officer and Instructor for ODU. The appointment was on a restricted basis through September 13, 2013. Ms. Maynard was the first Black woman on the major gifts team, and all of her colleagues were White.

7. Issues related to Ms. Maynard's race arose from the start of her employment with ODU.[1] Ms. Maynard's first immediate supervisor was Tricia Hudson-Childers, a White woman who was then the Director of Major Gifts for ODU. Ms. Hudson-Childers asked Ms. Maynard at an introductory lunch shortly after she was hired whether all of Ms. Maynard's children have the same father. The question evoked racial overtones and discriminatory presumptions that, as Black woman, Ms. Maynard would have children out-of-wedlock with different fathers. (In fact, all three of Ms. Maynard's three children were born, in wedlock, to Ms. Maynard and her now-divorced husband.)

---

[1] This employment history is intended to set forth the context for the treatment of Ms. Maynard by ODU which follows.

8. When Ms. Maynard was first offered the position by Ms. Hudson-Childers, she was offered a starting salary of $65,000. Ms. Maynard was shocked, because she had a master's degree in public finance, 20 years of experience, and had earned as much as $110,000 previously. In her initial conversation with Ms. Hudson-Childers on this point, Ms. Maynard expressed concern over what seemed to be a "low-ball" offer given Ms. Maynard's background, education, experience, and salary history. Ms. Hudson-Childers said there was some room to negotiate, and she asked if Ms. Maynard would be willing to accept $70,000. Ms. Maynard ultimately accepted the position at an initial salary of $70,000.

9. However, during her first week of work, after learning more about the requirement of the position, Ms. Maynard sought advice from Dr. Charles Wilson, then the Dean of the College of Arts & Letters, the school at ODU for which she was the Major Gift Officer, on how she might approach this issue because she was still uncomfortable with the seemingly low salary. The Dean advised that Ms. Maynard should discuss the issue again with Ms. Hudson-Childers, and that Ms. Hudson-Childers should then discuss it with Alonzo Brandon, the Vice President overseeing major gifts[2], if she needed additional approval for any changes.

10. When Ms. Maynard broached the issue again with Ms. Hudson-Childers, Ms. Hudson-Childers replied that the salary was final. Ms. Maynard mentioned that she had sought the assistance of the Dean, who had told her that Ms. Hudson-Childers could discuss it with Mr. Brandon. Ms. Hudson-Childers said she would find out more and get back to Ms. Maynard. A few days later she did so, and she told Ms. Maynard that her salary had to stay at $70,000. Ms. Maynard does not know if Ms. Hudson-Childers actually discussed the salary issue with any other parties as requested by Ms. Maynard.

---

[2] Mr. Brandon, Vice President of Advancement at ODU, is a Black man.

3

11. Meanwhile, Ms. Maynard learned that all of her major gift colleagues, some of whom did not have master's degrees, had started their employment as Major Gift Officers ("MGOs") at $75,000 per year. On February 12, 2013, Ms. Maynard received an email sent to all instructional and administrative faculty from the Office of Institutional Equity and Diversity as part of an annual salary equity review seeking to identify and address differences in salary that may be caused by gender or ethnicity.

12. In response, Ms. Maynard sent a Memorandum to the Office or Institutional Equity and Diversity on February 14, 2013, setting forth the above facts and stating "there seems no logical reason why my salary should be $5,000 less (and I was offered $10,000 less). The only difference between me and ALL my peers is race. I believe a retroactive adjustment would be a fair solution to this situation."

13. Ms. Maynard received a reply dated May 3, 2013 from the Office of Institutional Equity and Diversity asserting that no change would be made because "the salary differential has been justified." However, on January 10, 2014, Ms. Maynard received an Equity Salary Adjustment to $75,000, indicating to her that someone else reviewed the request and decided to correct her salary.

14. Ms. Maynard thereafter received regular annual re-appointments each year and positive annual performance reviews. She regularly performed in the top third of her peers, raised over $2 million during her time at ODU, and clearly outperformed many of her peers. At the time of her later termination discussed below, she had raised more in gifts in fiscal 2019 than all but one of her peers, which totaled eight MGOs.

15. In February 2016, Ms. Maynard received a communication from a Wells Fargo bank officer concerning changes to gifts to ODU from the Allan and Margot Blank Foundation

4

("Blank Foundation") after the death of Allan Blank. Upon information and belief, the Wells Fargo information was routed to Ms. Maynard's office because the giving was intended to support music departments at ODU falling under the College of Arts & Letters.

16. Ms. Maynard followed up with the Wells Fargo bank officer as requested, and she learned of significant changes in the way that Wells Fargo would administer annual requests for grants from ODU from the Blank Foundation. Ms. Maynard recorded the contact information in the system used by ODU to document these contacts and information, and she later followed up internally with music and library faculty concerning this information as well. Ms. Maynard recommended that ODU take steps to apply annually for the funds as suggested by the Wells Fargo bank officer in this first contact, which suggested course ODU subsequently successfully followed.

17. However, Barbara Henley, Executive Director of Planned Giving at ODU, became upset that Ms. Maynard had even responded to Wells Fargo's letter to ODU concerning the Blank Foundation. Ms. Henley, a White woman, recorded in the contact report system that she "couldn't understand how things became so convoluted until I recently learned that Glenda had been communicating with Wells Fargo." Ms. Henley had not been involved in the initial gifts from the Blank Foundation, and she was not Ms. Maynard's supervisor. Nonetheless, she took it upon herself to criticize Ms. Maynard for even calling the Wells Fargo bank officer back, and she became hostile and condescending to Ms. Maynard, repeatedly questioning Ms. Maynard's skills, qualifications, and abilities without any justification. Ms. Henley did not treat other MGOs, all of whom were White, as she did Ms. Maynard.

18. On March 14, 2017, Ms. Maynard received a Notice of Appointment effective March 25, 2017 through March 24, 2018, at a salary of $76,500. This was a change in Ms. Maynard's annual employment status from an "emergency hire" to a "permanent [albeit annual]

5

employee" after her position was posted publicly and earned through a competitive process involving a search committee review of the candidate pool and interviews, among other steps.

19. Throughout 2018 and into 2019, there were several other incidents in which Ms. Maynard felt threatened and harassed because Ms. Henley apparently believed that Ms. Maynard did not show proper deference to Ms. Henley, or in which Ms. Henley questioned Ms. Maynard's skills and expertise. Ms. Maynard constantly sought to resolve all such conflicts amicably and collaboratively. Again, Ms. Henley did not condescend towards nor treat similarly situated White MGOs in a similar manner.

20. In March 2019, there was a meeting concerning credit for a $250,000 gift received from a prospect that Ms. Maynard had cultivated for six years and with whom Ms. Maynard had documented 32 contacts. Unlike other similar situations in which credit would be split between one MGO who cultivated a prospect and another who closed the gift, Ms. Maynard, the only MGO who was Black, did not receive any partial credit for the gift, while White colleagues who did so did received partial credit.

21. Even more telling, during a meeting on March 28, 2019, with Karen Gershman, Ms. Maynard's supervisor, to discuss credit for the gift, Page Stooks, who had been hired as Assistant Vice President for Campaigns and Leadership Giving, stated that Ms. Maynard "raised hell," "fussed" and was "upset" while discussing technical issues with the notification system concerning prospect contacts. Ms. Maynard took notes during this meeting and recorded those precise terms as used by Ms. Stooks. These characterizations were completely false, and justifiably perceived by Ms. Maynard as evoking a stereotyped image of Ms. Maynard as an "angry black woman." Ms. Maynard stopped Ms. Stooks at the moment that these comments were made, stating that these comments inaccurately described Ms. Maynard's reactions. Ms. Stooks

apologized for using those terms and said she would take those comments "off the table." Ms. Maynard sent Ms. Gershman a follow-up email to document this incident for the meeting notes.

22. In July 2019, Ms. Maynard was told by an associate dean of the College of Arts & Letters, Dr. Janet Katz, that a prospect wanted to make a make a gift to the College in honor of his late wife, who had worked at ODU and passed away within the past year. Dr. Katz asked Ms. Maynard to locate the Memorandum of Understanding ("MOU") for a scholarship like that which might be established by this prospect. Ms. Maynard located the MOU requested and provided it to Dr. Katz. Dr. Katz told Ms. Maynard not to contact the prospect as he was going on vacation and would contact Ms. Katz upon his return. Ms. Maynard complied with these instructions. Ms. Maynard also entered this information into the contact system, which is viewable by all involved in fundraising and development, including Ms. Henley and Ms. Maynard's supervisors, and she entered this information on her weekly activity report.

23. While entering this information into the contact system, Ms. Maynard looked in the contact system, and she saw that there had been four contact reports over five years on the deceased wife from Barbara Henley, who was listed as the prospect manager for the now-deceased wife. There had also been one contact recorded from Ms. Maynard, and several from two other MGOs. None of these contacts were strategic towards closing of a gift, nor were they recent, and none were with the prospect, but rather his deceased wife. Nonetheless, Ms. Maynard relayed the information she received from Dr. Katz to Ms. Henley, because Ms. Maynard knew that Ms. Henley was very sensitive to MGOs making proposals to "her" prospects. She also documented her communications with Dr. Katz and Ms. Henley on her weekly activity report and in the contact system.

24. Significantly, throughout her tenure at ODU, Ms. Maynard was also told that ODU's policy was that "planned giving" and "planned gifts" were defined as gifts planned and established during the lifetime of the donor for future donations, often as part of an estate plan, but not for immediate cash gifts to ODU.

25. On July 29, 2019, Ms. Maynard was specifically asked by Dr. Katz to return a call made by the prospect to Dr. Katz after the prospect's return from vacation. Dr. Katz had given Ms. Maynard's name to the prospect and told him Ms. Maynard would call him back. After calling the prospect back on July 29th as specifically requested by Dr. Katz, and again understanding that Ms. Henley was very sensitive to MGOs making proposals to "her" prospects, Ms. Maynard sent an email that afternoon to Dan Genard, the Associate Vice President of University Advancement, asking how she should proceed, and if she should go ahead and make a proposal to the prospect. Mr. Genard replied that evening to Ms. Maynard that she should discuss it with Ms. Henley and let Mr. Genard know what they (Ms. Henley and Ms. Maynard) decided.

26. As instructed, Ms. Maynard sent an email the next morning to Ms. Henley to let her know of the prospect's intentions and politely inviting Ms. Henley's involvement in securing the gift, which would be a cash gift for $25,000. Ms. Henley became suddenly irate and demanded a meeting with Mr. Genard and Ms. Maynard, at which meeting (on the next day, July 31st) Ms. Henley was angry and condescending towards Ms. Maynard and falsely accused Ms. Maynard of somehow engaging in inappropriate and nefarious conduct in the matter, even though Ms. Maynard's actions in the matter had been publicly documented in the contact system and in the weekly activity reports. Ms. Henley also made it clear at the meeting that she had been compiling a "list" of supposed similar improper actions by Ms. Maynard.

27. Significantly, in addition to the $250,000 gift referred to above in paragraph 20, on several other occasions other MGOs had closed gifts from prospects that Ms. Maynard cultivated and was listed as the prospect manager for in the contact system, including at least one where Ms. Henley closed a gift from Ms. Maynard's established prospect. Ms. Maynard requested a similar meeting to the one Ms. Henley requested in this situation. No such meeting was provided to Ms. Maynard, who is Black, as was provided to Ms. Henley, who is White. Instead, Ms. Maynard was told that her contacts had not been strategic nor recent towards closing the gift, and she received no credit. Here, however, even though Ms. Henley was *not* listed as the prospect manager for the prospect, and her contacts with the deceased wife had not been strategic nor recent, Ms. Henley was granted the meeting at which Ms. Maynard was falsely accused of somehow going behind Ms. Henley's back.

28. Ms. Maynard prepared and sent an email to Dan Genard the next day, August 1, 2020, in which she specifically complained of this differential treatment from her colleagues (who were all White, as Mr. Genard well knew) and her superiors and the hostile work environment she was experiencing.

29. Ms. Maynard also determined that she needed to make a complaint to the Human Resources Department ("HR") at ODU concerning this differential treatment and hostile work environment and seek HR's advice on how the situation might be remedied.

30. On August 6, 2019, Ms. Maynard met with Elle McNair, an employee in HR, and discussed these issues with her. Ms. Maynard conveyed to Ms. McNair that she was treated differently than her colleagues, that she was being "singled out," and that she was being harassed by the actions of Ms. Henley and others. Upon information and belief, Ms. McNair was aware that Ms. Maynard was the only Black woman on her team. Ms. McNair provided Ms. Maynard

with an ODU policy document concerning harassment and discrimination in the workplace, leading Ms. Maynard to feel that her concerns were being taken seriously. However, HR followed up with a couple of telephone calls, and then no further action was taken.

31. In mid-August 2019, in Ms. Maynard's regular monthly meeting with her supervisor Karen Gershman, Vice President for University Advancement Alonzo Brandon came into Ms. Gershman's office and closed the door. He was annoyed and irritated. He told Ms. Maynard that University President John Broderick was not pleased with the list of guests Ms. Maynard had submitted on behalf of the Dean of the College of Arts & Letters to attend the President's Suite for the season opener football game at ODU's new stadium for the game scheduled against Norfolk State University on or about August 31st. Mr. Brandon specifically mentioned certain Black donors by name on Ms. Maynard's list, and he declared that "they did not have money" and should not be included on the invitation list. Ms. Maynard was very uncomfortable with his suggestion that she should disinvite these Black donors, and with the discriminatory presumption that these Black donors would not have money to donate to ODU. Ms. Maynard felt it would be discourteous and look bad for the University if it disinvited the Black donors, and she conveyed this information to Mr. Brandon.

32. Mr. Brandon did not question Ms. Maynard's invitation of any of the White guests on the College of Arts and Letters list. He also told Ms. Maynard that President Broderick was also not pleased with the Dean of the College, Dr. Kent Sandstrom, because he had not attended the President's retreat. Mr. Brandon then told Ms. Maynard that if he ever heard that she had repeated any of the information discussed during this meeting, he would deny it and "fire you on the spot." Before he said this, he paused and turned to Karen Gershman and said, "Karen, you are

my witness, you are hearing this, do you agree that you are hearing this." Ms. Gershman looked very uncomfortable and reluctantly nodded her head.

33. Before he left the meeting, Mr. Brandon also instructed Ms. Maynard to call him later and justify the presence of everyone whom Ms. Maynard was inviting to the game on behalf of the College. He specifically instructed Ms. Maynard *not* to send this information to him via email, and Ms. Maynard knew that Mr. Brandon did not like "paper trails." Because the situation seemed like it was a problem brewing, Ms. Maynard documented her thought process, interactions, and justification for each donor invited. One Black donor in question had given $16,000, which was a relatively large amount for ODU, and that donor had not ever been contacted or engaged by anyone prior to Ms. Maynard reaching out to her. She had asked if she could bring some of the alumni whom Mr. Brandon dismissively stated did not have money. This donor was coming in from New Jersey and making a special trip to attend the game. Ms. Maynard called Mr. Brandon as he instructed and provided this information. She was then told that she could go ahead and continue to invite those guests.

34. On August 30, 2019, Ms. Maynard received an email from David Mallin, Film Program Director at ODU, concerning whether the development office at ODU would commit to supporting a pre-party for a planned showing later in September 2019 of the movie *American Dreamer*, which had been directed and co-written by Derrick Borte, a White alumnus of ODU. The movie was to premiere nationally on or about September 19, 2020, and the pre-party and subsequent screening at ODU was being planned for September 21, 2020. Ms. Maynard forwarded the email to her superior, Dan Genard, to let him know about this request to the development department and to get his thoughts on the matter.

35. The previous year, in the Fall of 2018, Ms. Maynard had traveled to Charlottesville to the Virginia Film Festival with a group from ODU, including donors, who were invited to the event to see a pre-release version of the film. Ms. Maynard was appalled and very uncomfortable, both for herself and her donors, upon watching *American Dreamer* at the Film Festival. The film, in her view, trafficked in stereotypical views of Black men as angry drug dealers, and the dialog in the movie featured liberal and gratuitous use of the N-word throughout. A New York Times review of the movie dated September 12, 2019[3] calls the movie a "Cinematic Nightmare" and a "wreck" and states that "Mazz [the drug dealer], who is black, drops the N-word with abandon. The director, Derrick Borte, who wrote the script with Daniel Forte, seems to indulge this character's ostensible freedom to use the epithet beyond what is believable." The review concludes by bestowing the title "Worst Film of 2019"… "[b]y several lengths" to the movie.

36. Nonetheless, as set forth above, Ms. Maynard forwarded Mr. Mallin's email to Dan Genard on August 30. She also sent a text message to Mr. Mallin that day letting him know that although she found the content and language of the movie "personally offensive" and would therefore not attend or invite anyone to attend (for this second time). However, Ms. Maynard also told Mr. Mallin in the text that she would talk to Dan Genard and see if Mr. Genard had anyone in mind that he thinks would be interested, which she subsequently did when the event was discussed in departmental meetings, as it was clear that the event was moving forward.

37. On Monday September 2, 2019, Ms. Maynard received a telephone call from Dr. Avi Santo, Chair of the Communications Department at ODU, of which the Film Program was a constituent part. Dr. Santo asked Ms. Maynard word to the effect of "What is this I hear about that you were offended about the movie?" Ms. Maynard expressed her concerns about the movie as

---

[3] The New York Times review is available at https://nyti.ms/30aNZuD.

set forth above, and she indicated that, having seen the movie once already with donors, she felt she need to protect her relationships with donors and therefore could not attend this second time. Dr. Santo, a White man who is married to a Black woman, indicated he understood and was not in any way critical of Ms. Maynard.

38. On Wednesday, September 4, 2019, Ms. Maynard received an angry telephone call from Mr. Brandon. He reprimanded Ms. Maynard for not wanting to see the film, with its stereotypes and wholly gratuitous use of the N-word throughout, for a second time. Mr. Brandon told Ms. Maynard that "they use the N-word all the time on TV." Mr. Brandon said that Derrick Borte had called, and that was also going to complain to President Broderick about Ms. Maynard by name. Mr. Brandon wanted to know what Ms. Maynard had told David Mallin that would result in the call to him from Derrick Borte. Ms. Maynard told Mr. Brandon that she would send him a screenshot of the text message she had previously sent to David Mallin, letting Mr. Mallin know that, while she found the film "personally offensive" because of its content and language, she would still follow-up with Dan Genard about seeing if he knew people that would like to attend. Ms. Maynard in fact sent Mr. Brandon a screen shot of the text message as requested by Mr. Brandon.

39. On September 21, 2019, the pre-party and film showing of *American Dreamer* occurred at ODU.

40. On November 11, 2019, less than seven weeks later, Ms. Maynard was abruptly and without warning called into a meeting with Dan Genard and Karen Gershman. She was told that her appointment would not be renewed and she would be terminated at the end of six months, per ODU policy. When asked why, Mr. Genard and Ms. Gershman said the department was moving in a "different direction." When asked if she, Ms. Maynard, was the only one affected by

13

this supposed "new direction," Mr. Genard and Ms. Gershman refused to answer. Ms. Maynard asked if the decision had to do with performance or numbers, and they denied that this was the case. In fact, at the time in fiscal 2019, Ms. Maynard had secured more donations for ODU than all but one other MGO.

41. That same day, Ms. Maynard asked Dr. Sandstrom, the Dean of the College of Arts & Letters for which Ms. Maynard was the assigned MGO, if he was aware of this decision. He told Ms. Maynard he found out only minutes before she did. Dr. Sandstrom expressed shock, surprise, and regret about the decision, which suggests that this supposed "new direction" did not involve any consultation with the Dean of the College at issue and for which Ms. Maynard raised funds. This raises considerable doubt as the veracity of the explanation for her termination given Ms. Maynard.

42. The next day, November 11, 2020, Ms. Maynard called Mr. Brandon about her termination. Mr. Brandon repeated to Ms. Maynard that they were moving in a "new direction." He said he had tasked his subordinates Dan Genard, Page Stooks, and Karen Gershman with the decision, and that he only went along with it.

43. Ms. Maynard was the only one who was let go as a result of the supposed "new direction." Aside from a Black man re-hired[4] to support the business school two weeks before Ms. Maynard was told she would be terminated, during all relevant time periods Ms. Maynard was the only Black MGO at ODU. No White MGOs were terminated as part of the alleged new direction.

44. Ms. Maynard's termination followed closely in time her complaints to HR in August 2019 about being singled out and treated differently from her colleagues, all of whom were

---

[4] Upon information and belief, that MGO was let go by ODU before Ms. Maynard first became employed in 2012 for lack of production.

14

White.  It also followed closely in time her complaints about the racist elements in the movie *American Dreamer* in September 2019.

45. Ms. Maynard was later informed by ODU that the move was made because ODU wanted someone with museum fundraising experience to assume her role.  In fact, since she was terminated, her MGO role with the College of Arts and Letters was first filled first by Karen Gershman (who shortly thereafter left ODU), and then, to date, by Peter Lawrence, a White man.  Neither Ms. Gershman nor Mr. Lawrence had any museum fundraising experience.  Ms. Maynard by contrast, previously worked for the Newbold-White House museum and historic site, and her duties included fundraising.

46. Ms. Maynard, proceeding *pro se*, timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission on December 5, 2019, alleging both racial discrimination and retaliation, to which ODU responded.  The EEOC issued a "right to sue" letter dated August 27, 2020, a copy of which is attached hereto as Exhibit A.  This action followed.

## CAUSES OF ACTION

### Count I: Racial Discrimination/Harassment
### 42 U.S.C. § 2000e-2 (Title VII)

47. The facts alleged above are incorporated by reference.

48. While employed by ODU, Ms. Maynard, a Black woman, was treated differently and adversely as compared to her White colleagues performing the same MGO role and similar fundraising roles.  She was singled out for criticisms and harassment by colleagues and superiors that was not justified by legitimate business reason, and she was not accorded the same treatment as her White colleagues in situations such as conflicts or potential conflicts over contacts with donor and credit for gifts received by ODU.

49. This persistent and severe harassment and discriminatory conduct by Ms. Henley and others altered the conditions of Ms. Maynard's employment and created an abusive and hostile work environment.

50. In fact, the conduct was so severe that Ms. Maynard complained to her superiors and to HR about her treatment. She also complained to her superiors about the racist elements in the movie, *American Dreamer,* that she had supported in one showing, when she was asked to support it in another. However, rather than adequately addressing Ms. Maynard's concerns, her appointment as a MGO was summarily non-renewed by ODU, without any warning, shortly after raising these complaints. Based on ODU's course of conduct, Ms. Maynard's race, Black, was clearly a motivating factor in the termination of Ms. Maynard's employment with ODU.

51. As a direct and proximate result of the illegal discrimination outlined above, Ms. Maynard has suffered lost wages and employment benefits, and she has endured severe emotional distress accompanied by physical symptoms.

## Count II: Retaliation
## 42 U.S.C. § 2000e-3 (Title VII)

52. The facts alleged above are incorporated by reference.

53. ODU terminated Ms. Maynard's employment as MGO because, and shortly after, she had complained to HR about her discriminatory treatment as set forth above. Ms. Maynard was also terminated by ODU because, and shortly after, she complained to ODU about the racist elements of the movie *American Dreamer,* directed and co-written by a White alumnus of ODU, as set forth above.

54. As a direct and proximate result of ODU's illegal retaliation, Ms. Maynard has suffered lost wages and employment benefits, and she has endured severe emotional distress accompanied by physical symptoms.

## Count III: Racial Discrimination in the Making and
## Enforcement of Plaintiff's Employment Contract
## 42 U.S.C. § 1981

55. The facts alleged above are incorporated by reference.

56. While employed by ODU, Ms. Maynard, a Black woman, was treated differently and adversely as compared to her White colleagues performing the same MGO role and similar fundraising roles. She was singled out for criticisms and harassment by colleagues and superiors that was not justified by legitimate business reason, and she was not accorded the same treatment as her White colleagues in situations such as conflicts or potential conflicts over contacts with donor and credit for gifts received by ODU.

57. This persistent and severe harassment and discriminatory conduct by Ms. Henley and others altered the conditions of Ms. Maynard's employment and created an abusive and hostile work environment.

58. In fact, the conduct was so severe that Ms. Maynard complained to her superiors and to HR about her treatment. She also complained to her superiors about the racist elements in the movie, *American Dreamer,* that she had supported in one showing, when she was asked to support it in another. However, rather than adequately addressing Ms. Maynard's concerns, her appointment as a MGO was summarily non-renewed by ODU, without any warning, shortly after raising these complaints. Based on ODU's course of conduct, Ms. Maynard's race, Black, was clearly a motivating factor in the termination of Ms. Maynard's employment with ODU. Accordingly, ODU has intentionally infringed upon Ms. Maynard's rights secured by 42 U.S.C. § 1981.

59. As a direct and proximate result of the illegal discrimination outlined above, Ms. Maynard has suffered lost wages and employment benefits, and she has endured severe emotional distress accompanied by physical symptoms.

### Count III: Retaliation
### 42 U.S.C. § 1981

60. The facts alleged above are incorporated by reference.

61. ODU terminated Ms. Maynard's employment as MGO because, and shortly after, she had complained to HR about her discriminatory treatment as set forth above. Ms. Maynard was also terminated by ODU because, and shortly after, she complained to ODU about the racist elements of the movie *American Dreamer,* directed and co-written by a White alumnus of ODU, as set forth above.

62. As a direct and proximate result of ODU's illegal retaliation, Ms. Maynard has suffered lost wages and employment benefits, and she has endured severe emotional distress accompanied by physical symptoms.

WHEREFORE, Ms. Maynard respectfully requests that this Court grant the following relief:

A. A judgment in favor of Plaintiff and against Defendant for compensatory damages;

B. A judgment in favor of Plaintiff and Defendant for punitive damages;

C. An assessment of reasonable attorneys' fees and costs in favor of Plaintiff and against Defendant;

D. Enter a declaratory judgment that Defendant violated Plaintiff's right under the laws of the United States;

  E. Enter an injunction compelling Defendant to reinstate Plaintiff, and prohibiting Defendant from further discrimination and retaliations or, in the alternative, compelling Defendant to pay Plaintiff "front-pay;"

  F. Granting Plaintiff such other and further relief as the nature of her cause may warrant.

*Trial by Jury is Demanded.*

Dated: November 25, 2020    **MEYERGOERGEN PC**

              */s/ Scott A. Simmons*
              Scott A. Simmons (VSB No. 37744)
              Christopher J. Habenicht (VSB No. 15146)
              1802 Bayberry Court, Suite 200
              Richmond, Virginia 23226
              Telephone: 804.288.3600
              Facsimile: 804.565.1231
              simmons@mg-law.com
              habenicht@mg-law.com
              *Counsel for Plaintiff*