**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

GLENDA L. MAYNARD,

    Plaintiff,

        v.                                   Civil Action No. 2:20-cv-597

OLD DOMINION UNIVERSITY,

    Defendant.

**MEMORANDUM OPINION**

This case arises out of the termination of Plaintiff Glenda Maynard ("Plaintiff"), an employee of Old Dominion University ("Defendant" or "ODU"). Plaintiff alleges that ODU terminated her because of her race, in violation of 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1981, as well as retaliation under 42 U.S.C. § 2000e-3 and 42 U.S.C. § 1981. *See generally*, Compl., ECF No. 1. ODU has moved for summary judgment as to all claims. Mot. for Summ. J., ECF No 14; Mem. in Supp., ECF No. 15. Plaintiff opposes ODU's motion, which is ripe for decision. Mem. in Opp'n, ECF No. 17; Reply, ECF No. 22.

After examining the briefs and the record, the Court determines that a hearing is unnecessary because the facts and legal contentions are adequately presented and oral argument would not aid the decisional process. Fed. R. Civ. P. 78(b); E.D. Va. Loc. R. 7(J). Therefore, ODU's request for a hearing, ECF No. 23, will be denied. For the reasons stated below, ODU's Motion for Summary Judgment, ECF No. 14, will be granted, and ODU's Omnibus Motions in Limine Nos. 1-3, ECF No. 24, will be denied as moot.

## I. FACTS[1]

Plaintiff, an African American woman, worked as a Major Gifts Officer in ODU's Office of Development from 2012 to 2020, when she was terminated following ODU's non-renewal of her employment contract. Defendant's Statement of Undisputed Facts ("DSUF") ¶¶ 2, 9, ECF No. 15. The Court outlines the most relevant facts below, drawing all reasonable inferences in the light most favorable to Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Lettieri v. Equant, Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### A. Plaintiff's Hiring and Rehiring

ODU first hired Plaintiff, who holds a Bachelor of Arts in English and a master's degree in Public Administration, Public Finance, and Financial Management, as an emergency hire in 2012. DSUF ¶¶ 1–2. Plaintiff was assigned to support and fundraise for ODU's College of Arts and Letters ("College"). *Id.* ¶ 2.

Tricia Hudson-Childers hired Plaintiff in 2012, but was subsequently replaced by Karen Gershman ("Gershman"), Director of Major Gifts. Gershman was Plaintiff's direct supervisor until Plaintiff's termination. *Id.* ¶ 2. Gershman was in turn supervised by Page Stooks ("Stooks"), Assistant Vice President of Campaigns and Leadership Giving. *Id.* ¶ 4. Dan Genard ("Genard"), Associate Vice President of University Advancement, supervised Stooks, and Alonzo Brandon ("Brandon"), Vice President for University Advancement, was senior to Genard and oversaw "all

---

[1]    Local Rule 56(B) requires that a brief in response to a summary judgment motion include a "section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated." Plaintiff includes the required list of disputed facts, but also includes her own statement of facts she contends are undisputed. *See* Mem. in Opp'n 2–9, ECF No. 17. Although the Court is not required to consider Plaintiff's statement of facts, it has been considered to the extent supported by the record.

development efforts on behalf of ODU." *Id.* ¶ 4.[2]

Because Plaintiff was initially hired on an emergency basis, she was required to undergo a competitive hiring process to maintain her position beginning in February 2017. *Id.* ¶ 5; Plaintiff's Disputed Material Facts ("PDMF") ¶ 1, ECF No. 17.[3] ODU posted the position, reviewed the pool of applicants, and interviewed applicants by phone and in person. DSUF ¶ 5. At the end of the process, Gershman—with Genard's involvement and approval—selected Plaintiff as "the best qualified of the narrowed pool of candidates," and rehired her for the same position, Major Gifts Officer supporting the College. *Id.* ¶ 6. For most of Plaintiff's tenure at ODU, the only other African American Major Gifts Officer in the Office of Development, Ashley Green, worked in California. *Id.* ¶ 2; Gershman Dep. 13:4–14:13, ECF No. 15-2. In September 2019, Gershman hired another African American Major Gifts Officer, Mike Walker. DSUF ¶ 7; Gershman Dep. 14:2–9, ECF No 15-2.

## B. Conflict and Complaints

### 1. Complaints about *American Dreamer*

*American Dreamer* is a film shot on-site at ODU and directed by ODU alumnus Derrick Borte ("Borte"). DSUF ¶ 24. In 2018, Plaintiff took donors to watch the film at an ODU-sponsored event at the Virginia Film Festival in Charlottesville. *Id.* Subsequent to this event, the film was scheduled to premiere in Norfolk in September 2019. *Id.* ¶ 25. David Mallin ("Mallin"), ODU's Film Program Director, asked Plaintiff to contribute money from the Office of Development budget to an event associated with the premiere. *Id.* Plaintiff forwarded Mallin's email to Genard,

---

[2]  Gershman, Stooks, and Genard are white; Brandon is African American. DSUF ¶ 4.

[3]  Plaintiff does not dispute DSUF ¶ 5 but adds that the competitive rehiring process began in February 2017. PDMF ¶ 1.

asking of Genard, "Thoughts?" but responded to Mallin via text that "[she] found the content and language in the movie personally offensive so [she] won't be attending or inviting anyone." *Id.*, *American Dreamer* Email, ECF No. 15-12; *American Dreamer* Text, 15-13. Mallin relayed Plaintiff's concerns to Borte, who in turn complained to Brandon that ODU was not doing enough to support his film. DSUF ¶ 26. Sometime before the film premiere in Norfolk, Brandon contacted Plaintiff, who explained that she was offended by "[t]he use of the n-word" in the film. *Id.* ¶ 27. Brandon "absolutely" recognized that some people "would be turned off by the use of the n-word" and did not force Plaintiff to attend or invite donors to the premiere. *Id.* Genard invited donors to the premiere and attended the event in Plaintiff's stead. *Id.* ¶ 28.[4]

### 2. Potential Donors

One of Plaintiff's job duties as a Major Gifts Officer was to invite donors to ODU football games. *Id.* ¶ 22. On one such occasion, Brandon questioned three of Plaintiff's potential invitees. *Id.* Brandon knew the potential invitees—a teacher, a high school baseball coach, and a government employee—personally, and was concerned they did not have the resources to contribute substantial amounts to ODU. *Id.* While all three potential invitees were African American, Brandon did not mention race in discussing the list with Plaintiff, and Brandon did not question the inclusion of other African American donors on Plaintiff's list. *Id.* It was not unusual for Brandon to question an invitee list, and Brandon had previously disallowed invitees chosen by ODU's President and Board of Visitors because they were "speculative" and did not have a "very, very strong reason to be there." *Id.* After meeting with Brandon, Plaintiff drafted an email

---

[4]     Plaintiff disputes portions of DSUF ¶¶ 24–28. Specifically, Plaintiff takes issue with Defendant's representations regarding whether and when Plaintiff told Genard and other co-workers that she did not care for *American Dreamer* and that Brandon requested a screen shot of Plaintiff's text to Mallin so that Brandon could protect her from any "backlash." PDMF ¶¶ 12–13; DSUF ¶ 27. The facts presented above are undisputed.

explaining her strategy for each donor on her list, including the three potential donors Brandon had questioned. *Id.* ¶ 23. Brandon ultimately accepted Plaintiff's invitee list as originally proposed. *Id.*

### 3.  Conflict with Planned Giving

During her employment at ODU and as early as 2016, Plaintiff had multiple disputes with a colleague, Barbara Henley ("Henley"). *Id.* ¶¶ 29, 31. Henley, as Director of Planned Giving Development, oversaw planned gifts at ODU and reported directly to Genard. *Id.* ¶ 29. Henley did not have any supervisory role with respect to Plaintiff or involvement in Plaintiff's evaluations. *Id*. Plaintiff and Henley's arguments centered around credit for planned gifts. *Id.* Although Major Gifts Officers like Plaintiff were permitted to help identify and solicit planned gifts, they were required to do so in concert with planned giving staff because of the technical and legal aspects of planned giving. *Id.* ¶ 30. Pursuant to Office of Development policy, credit for planned gifts was split between the Major Gifts Officers and planned giving staff involved. *Id.* According to Henley, "practically every [Major Gifts Officer] through the years" failed to contact her regarding a planned gift, but Plaintiff "would have been the one who did this most often." Henley Dep. 25:2–13, 27:1–12, ECF No. 15-14. On July 30, 2019, Henley and Plaintiff exchanged emails regarding Plaintiff's contact with a potential donor, each expressing "disappoint[ment]" with the other's behavior. Henley Emails, ECF No. 17-13. Nevertheless, Plaintiff does not identify any loss in compensation or benefits related to her disputes with Henley and her performance did not suffer as a result of those conflicts. DSUF ¶ 34.

### 4. Contacts with Human Resources

In August 2019, Plaintiff was prompted to go to ODU Human Resources ("HR") after a meeting with Henley and Genard regarding gift credit in which Plaintiff perceived Henley's

demeanor toward her as "nasty" and "rude." *Id.* ¶ 37. At the August 6, 2019 meeting, Plaintiff met

with Elle McNair, an HR Employee Relations Consultant ("HR Consultant"), and told her that:

> I was being singled out, I was being bullied and harassed and mistreated and that I
> was treated differently than the others on my team and that there were situations
> with gift credit and I would have preferred to just work with Brett Smiley and not
> have to work with Barb Henley and that I was very concerned about the treatment,
> that I felt like it was perhaps going to adversely affect my employment, and I needed
> help, I needed support, and I didn't feel that I was supported in the department, and
> that I was really asking them to maybe mediate something or have a meeting with
> Karen [Gershman] and Dan [Genard] and Barb [Henley] to settle the issue.

> *Id.* ¶¶ 35-37; Plaintiff Dep. 48:21–49:8, ECF No. 15-7.

Plaintiff gave the HR Consultant a copy of an email she sent to Genard on August 1, 2019,

outlining her concerns. DSUF ¶ 37; Genard Email, ECF No. 15-18. In the email, Plaintiff explained

that she felt colleagues were "gang[ing] up" against her, "creat[ing] documentation" for her

employment record, and treating her in a way that was "highly out of order." *Id.* Plaintiff also

provided the HR Consultant with donor contact reports to provide examples of situations in which

she felt she had been treated differently. DSUF ¶ 37. The HR Consultant documented the meeting

in an "Employee Relations Contact" form. ECF No. 15-17. Plaintiff did not explicitly tell the HR

Consultant she believed she was being treated differently on the basis of her race, and the HR

Consultant interpreted Plaintiff's concerns as a "conflict/co-worker" dispute rather than a

"discrimination/[equal opportunity] concern." DSUF ¶ 38.

The HR Consultant noted the August 6, 2019 meeting in a weekly log, which JaRenae

Whitehead, Assistant Vice President for HR ("HR Assistant VP"), reviewed. *Id.* The HR Assistant

VP and HR Consultant called Plaintiff together to discuss her concerns about Henley in more

detail. *Id.* During the call, the HR Assistant VP asked Plaintiff a series of questions to determine

whether she was making a complaint of unlawful discrimination, harassment, or retaliation that

required referral to "Equity and Diversity." *Id.* Plaintiff did not say that she felt she was being

treated differently because of her race, but when asked why she felt she was being treated differently, Plaintiff responded, "Why do you think?" Whitehead Dep. 36:14–15, ECF No. 17-3. Based on Plaintiff's responses to her questions, the HR Assistant VP, like the HR Consultant, determined that the conflict between Plaintiff and Henley was a "workplace conflict based on personality" that did not rise "to the level of harassment or hostile work environment." *Id.*

After the August 6, 2019 meeting and follow up call with the HR Assistant VP and the HR Consultant, Plaintiff had a third conversation with HR about Henley in August 2019 with September Sanderlin, Vice President for HR ("HR VP"). *Id.* ¶ 39; Plaintiff Dep. 81:4–9, ECF No. 15-7. Plaintiff did not tell the HR VP she believed Henley was singling her out because of her race. DSUF ¶ 39; Plaintiff Dep. 81:4–9. The HR Consultant, HR Assistant VP, and HR VP did not believe Plaintiff's contact with HR warranted additional investigation. DSUF ¶ 39. Plaintiff was directed to talk with her third-level supervisor, Genard, and follow up with HR thereafter but did not do so. *Id.*

HR did not notify Genard of the August 6, 2019 meeting or follow up calls with Plaintiff. *Id.* ¶ 40.[5] However, separate and apart from Plaintiff's contact with HR, Stooks, Plaintiff's second-level supervisor, reached out to the HR Assistant VP to report Plaintiff's conflict with Henley. Whitehead Dep. 66:5–22, ECF No. 15-9. Stooks's independent report prompted the HR Assistant VP to suggest to Stooks that Genard meet with Plaintiff and Henley. DSUF ¶ 40. Stooks was not

---

[5]    Plaintiff claims that DSUF ¶ 40 is "misleading" because while it is "technically true" that HR did not contact Genard about Plaintiff's communications with HR, Genard and other decisionmakers knew about Plaintiff's complaint because HR suggested to Stooks that Genard meet with Plaintiff and Henley following Stooks's report of the Henley/Plaintiff conflict to HR. PDMF ¶ 15. Although the deposition testimony is clear that HR advised that Genard meet with the two women *after* Plaintiff's complaint, Plaintiff points to no testimony indicating that HR told anyone in the Office of Development *about* Plaintiff's complaint.

aware that Plaintiff had also complained about Henley to HR.[6] Stooks Decl. ¶ 3, ECF No. 22-2. Plaintiff did not tell her supervisors or any of her coworkers she had complained to HR. DSUF ¶ 40.

### C. Non-Renewal of Plaintiff's Employment Contract with ODU

ODU's Barry Art Museum (the "Museum"), funded by a gift from Richard and Carolyn Barry, opened on November 14, 2018. DSUF ¶ 10; Brandon Dep. 108:4–13, ECF No. 15-5.[7] Although the Barrys had planned to "support the [Museum's] operations, exhibitions, [and] programmings," it became apparent that the Museum required ODU's fundraising and

---

[6]     Plaintiff asserts that the following exchange makes it "clear" that Stooks was informed of Plaintiff's complaint to HR:

> Q: Okay. And Dan Genard was never—no one from HR ever discussed any of the concerns or issues that were raised by Miss Maynard in August 2019, no one from HR ever spoke to Mr. Genard about those concerns?
>
> A: To my knowledge, Mr. Genard specifically, no; however, Miss Maynard's supervisor's supervisor, Page Stooks, yes.

Whitehead Dep. 63:21–64:3, ECF No. 17-3.

However, as explained above and in footnote 5, although the subject of the two complaints was similar (i.e., the Henley/Plaintiff conflict), the undisputed facts establish that while HR talked to Stooks about Stooks's concerns regarding the Henley/Plaintiff conflict and suggested that Genard meet with the two women, HR did not share the fact that Plaintiff had complained to HR with Stooks. Whitehead Dep. 66:9–67:21, ECF No. 15-9.

[7]     Plaintiff disputes DSUF ¶ 10, arguing that "assertions in paragraph 10 about the history of the [Museum] are not supported by the record, save for the [Museum's] opening date." *Id.* Rule 56 requires a party who disputes an asserted fact to support such dispute by "citing . . . particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also TecSec, Inc. v. Adobe Sys. Inc.*, 326 F. Supp. 3d 105, 108 (E.D. Va. 2018) ("A party opposing a motion for summary judgment must respond with specific facts, supported by proper documentary evidence, showing that a genuine dispute of material fact exists."). Plaintiff's assertion that evidence is lacking does not transform evidence with which Plaintiff disagrees into a controverted fact. Moreover, the record supports the details of the Museum's creation and background recounted here.

development support. DSUF ¶¶ 10–11; Brandon Dep. 108:4–19, ECF No. 15-5; Brandon Dep. 119:24–120:17, ECF No. 22-9. However, neither the Museum nor ODU could afford to create a new position dedicated solely to fundraising for the Museum. DSUF ¶ 12. In 2019, Brandon directed Gershman, Stooks, and Genard to devise a fundraising plan for the Museum using the Office of Development's existing staffing levels and funding. *Id.* ¶ 13.[8] After several meetings, Gershman, Stooks, and Genard decided to create a hybrid position that would support both the College and the Museum. *Id.* ¶ 14.[9] The group's plan was to eliminate Plaintiff's position, Major Gifts Officer assigned to the College, and create a new position, "Philanthropy Director for the College of Arts and Letters and the Barry Art Museum" ("Philanthropy Director"). *Id.* The rationale behind the decision to create the Philanthropy Director position while eliminating Plaintiff's position was that both the College and the Museum required fundraising support for the arts. *Id.* ¶ 15. Eliminating Plaintiff's position would not detract from fundraising for the College because Brandon was and would remain responsible for most of the major gifts made to the College. *Id.*

---

[8]     Plaintiff disputes portions of DSUF ¶¶ 11–13 and the timing of events asserted by ODU. PDMF ¶¶ 4–6. The facts recited here are either unchallenged by Plaintiff or, contrary to Plaintiff's assertions, supported by the record. For example, in response to ODU's contention that "[i]n June 2019, Brandon tasked Genard, Stooks, and Gershman with devising a plan for fundraising for BAM," Plaintiff argues, "Brandon did *not* state that he 'tasked' others to 'devis[e] a plan' in June 2019." DSUF ¶ 12; PDMF ¶ 6. While ODU does not cite to testimony in which Brandon makes such a statement word for word, the record reflects that Gershman, Genard, and Stooks "had gotten [a] directive from our leader Alonzo Brandon to look" at creating a new position to support the College and Museum several months before Plaintiff's non-renewal in November 2019 and "probably" in August or September 2019. Gershman Dep. 29:8–30:15, ECF No. 22-7.

[9]     Plaintiff disputes DSUF ¶¶ 10, 14, and 15 related to ODU's stated rationale for not renewing Plaintiff's employment contract because facts alleged in those paragraphs, according to Plaintiff, lack "timing or context," PDMF ¶¶ 7–8, and on the basis that "ODU has not produced any documents that show any final decision was made to change the Plaintiff's position before she was terminated." PDMF ¶ 3. But again, Plaintiff fails to cite contradictory facts.

The Philanthropy Director, equivalent to Gershman in seniority, would report to Genard. *Id.* It was also determined that a master's degree in Fine Arts or a bachelor's degree in Fine Arts with experience or training equivalent to a master's degree would be a required qualification for the position. *Id.* ¶ 18.[10] While Gershman, Stooks, and Genard developed the plan to create the Philanthropy Director position, they did so at Brandon's direction and the decision to eliminate Plaintiff's position was ultimately his. *Id.* ¶¶ 13, 15.

This was not the first time ODU had undertaken a reorganization of this type. ODU previously created a hybrid position when it eliminated the position of Katherine Huntoon, a white Faculty Administrator and Gallery Director for the Ellin and Baron Gordon Art Galleries, to hire someone with a Ph.D. in Fine Arts to assist the gallery as its reputation grew. *Id.* ¶ 17. ODU also non-renewed the contract of a white Major Gifts Officer, Denise Milisitz, in 2019 because it was "making a change in direction." PDMF ¶ 2; Gershman Dep. 68:1–69:4, ECF No. 17-4.

The Office of Development communicated with HR regarding the department reorganization and rationale in August 2019 and notified HR of the decision to eliminate Plaintiff's position thereafter. DSUF ¶ 16.[11] On November 11, 2019, Gershman and Genard told Plaintiff her contract, which could only be terminated for cause or non-renewal, would not be renewed because

---

[10]     Plaintiff disputes Brandon's role in the decision-making process but does not dispute that a master's degree in Fine Arts or a bachelor's degree with relevant experience was a requirement for the new position. PDMF ¶ 10.

[11]     Plaintiff disputes that "HR was notified of the decision not to renew [Plaintiff's] contract sometime in September" and points to testimony that the notification "likely could have been around September." PDMF ¶ 9. Regardless of the exact timing, "conversations regarding the reasoning and reorganization" with HR occurred in August, and there is no dispute that HR knew of the non-renewal and participated in the process of non-renewing Plaintiff's contract in the fall of 2019. Whitehead Dep. 50:13–23, ECF No. 17-3.

"they were moving in another direction." DSUF ¶ 8; Plaintiff Dep. 88:22, ECF No. 22-5.[12] In accordance with ODU policy, Plaintiff was given six months' notice and was paid her full salary and benefits until May 2020. DSUF ¶ 9.

Since the Philanthropy Director position was a hybrid position and ODU was required to maintain the current number of positions in the Office of Development, ODU could not post the Philanthropy Director position until Plaintiff's six-month notice period expired in May 2020. *Id.* ¶ 19.[13] By that point, the COVID-19 pandemic was in full swing, and ODU had implemented a hiring freeze in March 2020. *Id*. As of September 2021, the hiring freeze remained in effect, preventing the Office of Development from posting or hiring for the Philanthropy Director position even with an emergency hire. *Id.* Brandon has assisted with fundraising for the Museum since November 2019, and Peter Lawrence ("Lawrence"), a white Major Gifts Officer assigned to Northern Virginia, has assisted with fundraising for the College. *Id.* ¶ 20. Lawrence estimates that he devotes about half of his professional time to assisting the College. Lawrence Decl. ¶ 3; ECF No. 22-1.

---

[12]    Plaintiff does not dispute that this statement was made but does dispute the "veracity" of the statement. PDMF ¶ 2.

[13]    Plaintiff contends that it "seems untenable" that ODU could not post the Philanthropy Director position because of a hiring freeze. In support of her challenge, Plaintiff attaches an August 30, 2021 job posting for a different ODU office, the Office of Alumni Relations, and a list of Office of Development positions indicating that Plaintiff's former position, Major Gifts Officer for the College, is vacant. PDMF ¶ 11; Special Events Job Posting, ECF Nos. 17-7; Major Gifts Officer Position List, 17-8. Neither exhibit controverts the cited deposition testimony explaining that the Office of Development remains under a hiring freeze. DSUF ¶ 19. The Office of Alumni Relations is distinct from the Office of Development, and the fact that a position is listed as "vacant" in an online directory has no bearing on whether the Office of Development is currently hiring for that or any position. Special Events Job Posting, ECF Nos. 17-7; Major Gifts Officer Position List, 17-8.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a district court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Liberty Lobby Inc.*, 477 U.S. at 247–48 (emphasis in original). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for a nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012) (citations omitted).

In deciding a summary judgment motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted); *see also McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) ("[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (citing *Liberty Lobby*, 477 U.S. at 251–52)). It must also "disregard all evidence favorable to the moving party that the jury is not required to believe" and "give credence to . . . evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151 (internal quotations and citation omitted).

# III.  DISCUSSION

## A.  Section 1981 and Title VII

Plaintiff alleges racial discrimination/harassment and retaliation pursuant to 42 U.S.C. §§ 2000e-2 and 2000e-3 (Title VII) (Counts I and II) and racial discrimination in the making and enforcement of Plaintiff's employment contract and retaliation pursuant to 42 U.S.C. § 1981 (Counts III and IV).[14]

ODU interpreted Plaintiff's Complaint as advancing five theories of liability under Title VII and Section 1981: discriminatory termination, discriminatory failure to hire or promote, hostile work environment, disparate treatment, and retaliation. Mem. in Supp. 16, ECF No. 15. Plaintiff did not respond to ODU's arguments regarding the failure to hire or promote and hostile work environment claims, and, to the extent Plaintiff sought to raise those issues and claims, they are waived as a result. *See Cox v. Snap, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017) (issues ignored at summary judgment may be deemed waived). Plaintiff's discriminatory termination (under both Title VII and Section 1983), disparate treatment, and retaliation claims (under both Title VII and Section 1983) remain for decision.[15]

Title VII "forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin and (ii) retaliation against an employee for opposing adverse actions she reasonably suspects to be unlawful under Title VII." *Strothers v. City*

---

[14]    Count I of the Complaint is identical to Count III (with the exception of the last sentence of Count III alleging that ODU has "intentionally infringed upon Plaintiff's rights secured by 42 U.S.C. § 1981") and Count II is identical to Count IV (misnamed Count III in the Complaint). Compl. ¶¶ 47–62.

[15]    Although the Complaint does not expressly raise a disparate treatment claim, ODU construes the Complaint as including such a claim, and Plaintiff responds to ODU's argument. Reply 12, ECF No. 17. Thus, the Court will analyze the claim.

*of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018) (citations omitted); *see also* 42 U.S.C. §§ 2000e-2 (Title VII's anti-discrimination provision); *id.* § 2000e-3 (Title VII's anti-retaliation provision). The standard for establishing claims of employment discrimination and retaliation under either Title VII or Section 1981 is the same. *Gairola v. Commonwealth of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015).

### B. The *McDonnell Douglas* Framework

A plaintiff can meet her initial burden of proving a *prima facie* case of discrimination under Title VII or Section 1981 either through direct evidence or through the burden-shifting framework of *McDonnell Douglas*. *Strothers*, 895 F.3d at 327. Direct evidence is "conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal quotations and citation omitted). Plaintiff does not provide direct evidence of discriminatory conduct and must proceed under the *McDonnell Douglas* burden-shifting framework. *Sadeghi v. Inova Health Sys.*, 251 F. Supp. 3d 978, 991 (E.D. Va. 2017), *aff'd*, 711 F. App'x 174 (4th Cir. 2018) (applying the *McDonnell Douglas* test to Title VII claims); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) ("[T]he *McDonnell Douglas*] framework was initially developed for Title VII discrimination cases but has since been held to apply in discrimination cases arising under § 1981 and in retaliation cases under both statutes" (cleaned up)).

Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Guessous*, 828 F.3d at 216. If she meets her burden, ODU must then "articulate a non-discriminatory or non-retaliatory reason for the adverse action." *Id.* Finally, if

ODU meets its burden of production, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.* "The final pretext inquiry merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination, which at all times remains with the plaintiff." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010) (cleaned up). *See also Reeves*, 530 U.S. at 143 (a Title VII plaintiff must prove an employer's reasons were not true or "unworthy of credence").

### C. Discriminatory Termination

To establish a *prima facie* case of discriminatory termination, Plaintiff must show: (1) she is a member of a protected class; (2) she suffered from adverse employment action; (3) at the time the employer took the adverse employment action she was performing at a level that met her employer's legitimate expectations; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class.[16] *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

Plaintiff satisfies the first three elements of a *prima facie* case for discriminatory termination. She is African American, suffered an adverse employment action when her contract was not renewed, and by all accounts was meeting expectations when ODU fired her. The parties dispute whether Plaintiff's position remained open or was filled by a similarly qualified applicant outside the protected class. To show that a position remained open to similarly qualified applicants,

---

[16]    The elements of a discriminatory termination claim under Section 1981 are almost identical to those for a Title VII claim. To establish a *prima facie* case of discriminatory termination in violation of Section 1981, the plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *Honor v. Booz-Allen & Hamilton*, 383 F.3d 180, 188 (4th Cir. 2004). Neither ODU nor Plaintiff address the fourth element under Section 1981.

a plaintiff must provide evidence demonstrating that the employer filled the position or attempted to do so after the plaintiff's discharge. *Causey v. Balog*, 162 F. 3d 795, 802 (4th Cir. 1998).

Plaintiff alternatively argues that she has shown either that her position "remained open" or "was filled by a similarly qualified applicant outside the protected class." Mem. in Supp. at 6, 11, ECF No. 17. As to whether the position remained open, Plaintiff points to the online directory for the Office of Development, which lists Plaintiff's position as "vacant." Major Gifts Officer Position List, ECF No. 17-8. ODU responds that Plaintiff's position was eliminated, a fact Plaintiff fails to dispute, and therefore the position could not remain open. ODU further asserts that Plaintiff cannot show that ODU sought to fill her old position. In contending that her position was filled by a similarly qualified applicant outside the protected class, Plaintiff argues that another employee, Lawrence, a white male, "has taken over for now the totality of Plaintiff's former duties." Mem. in Supp. at 6, 11, ECF No. 17; Major Gifts Officer Position List, ECF No. 17-8. ODU disputes that only Lawrence has taken over Plaintiff's former duties, arguing that in addition to Lawrence, a member of the protected class, Brandon, has also absorbed a share of Plaintiff's former duties. Reply 3, ECF No. 22.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has failed to establish that ODU filled the position or attempted to do so after her termination. At most, the online directory establishes that Plaintiff's former position is vacant. But the document does not establish or even suggest that ODU is seeking to fill the position and Plaintiff does not otherwise introduce any evidence that ODU solicited or intends to solicit applications to fill the vacant position.

The United States Court of Appeals for the Fourth Circuit has considered similar evidence and concluded in that case that the fourth element for discriminatory termination was not met. *See Causey*, 162 F.3d at 802–03. In *Causey*, the plaintiff introduced a list of positions and

16

corresponding personnel that showed the plaintiff's former position as budgeted and vacant. *Id.* at 802. Rather than proving that plaintiff's position remained open, the list "support[ed] a finding that nobody replaced [plaintiff], and fail[ed] to demonstrate the [defendant] was actively seeking to fill the position, as [plaintiff] claims it does." *Id.* Like the list offered in *Causey*, the online directory Plaintiff has provided shows only that no one has replaced her. It does not demonstrate ODU has attempted to fill the position since Plaintiff's discharge, and does not support the fourth requirement of a *prima facie* case for discriminatory termination.

Similarly, the evidence, considered in a light most favorable to Plaintiff, does not establish that Plaintiff's position was filled by a similarly qualified applicant outside the protected class. Courts have "uniformly held that the redistribution of work to other employees, after eliminating a position, does not constitute replacement sufficient to satisfy the fourth prong of the *McDonnell-Douglas* test." *Ruddy v. Bluestream Pro. Serv., LLC*, 444 F. Supp. 3d 697, 708 and n.23 (E.D. Va. 2020) (collecting cases); *see also Waldrop v. Sci. Applications Int'l Corp.*, No. 10cv328, 2011 WL 4025410, at *4 (D. Md. Sept. 9, 2011), *aff'd*, 473 F. App'x 220 (4th Cir. 2012) (plaintiff did not establish the fourth element for a *prima facie* case where her position was eliminated and her duties were absorbed by another employee). The uncontroverted evidence demonstrates that is what occurred here. Plaintiff's position was eliminated, and although the parties dispute whether and to what extent Brandon or Lawrence absorbed Plaintiff's duties there is no genuine dispute that her duties have been absorbed by her former colleagues. *See Ruddy*, 444 F. Supp. 3d at n.23 ("Transfer of work by a terminated employee to other employees does not constitute 'replacement' in an employment discrimination context." (internal quotations and citation omitted)). Accordingly, Plaintiff has not established a *prima facie* case of discriminatory termination. Since Plaintiff has not established a *prima facie* case, the Court need not go further

under the *McDonnell Douglas* analysis, and an award of summary judgment to ODU is appropriate on Plaintiff's discriminatory termination claim.

### D. Disparate Treatment

To establish a *prima facie* claim for disparate treatment, Plaintiff must show: (1) she is a member of a protected class; (2) she suffered from adverse employment action; (3) at the time the employer took the adverse employment action she was performing at a level that met her employer's legitimate expectations; and (4) she was treated differently than similarly situated employees outside of the protected class. *Brockman v. Snow*, 217 F. App'x 201, 205 (4th Cir. 2007). This claim is similar to wrongful termination in that the first three elements of both claims are the same, but differ as to the fourth element. Additionally, if a plaintiff raises both claims she must demonstrate that she suffered an adverse employment action other than termination to support her disparate treatment claim. *See Scott v. Health Net Fed. Servs., LLC*, 807 F. Supp. 2d 527, 534 n.2 (E.D. Va. 2011), *aff'd*, 463 F. App'x 206 (4th Cir. 2012) ("[Defendant] is also entitled to judgment as a matter of law on plaintiff's disparate treatment claim . . . because she has not established that she suffered any adverse employment action other than her termination."). Otherwise, the disparate treatment claim would be duplicative and must be dismissed. *See, e.g., Beaubrun v. Thomas Jefferson Univ.*, 578 F. Supp. 2d 777, 781 n.3 (E.D. Pa. 2008) ("It would be redundant to analyze Disparate Treatment and Wrongful Termination as two separate claims when the only adverse employment action suffered by the plaintiff is the termination.").

ODU contends Plaintiff cannot meet the second and fourth elements of her disparate treatment claim because Plaintiff cannot establish she suffered an adverse employment action distinct from termination or that she was treated differently from similarly situated employees outside the protected class. Mem. in Supp. 23, ECF No. 15. Plaintiff points to her termination as

an adverse employment action for purposes of her disparate treatment claim and argues that she was treated differently because her white counterparts were "granted meetings by her direct superiors on issues of gift credits, while she was not." Mem. in Opp'n 13, ECF No. 17.

The Court need only consider whether Plaintiff can establish the second element, that she suffered an adverse action. The only evidence Plaintiff has provided of an occurrence that meets the standard for an adverse employment action is her termination. To the extent Plaintiff claims she also suffered an adverse employment action because she was denied meetings granted to her counterparts, such an action is not "the type of ultimate decision" affecting "hiring, granting leave, discharging, promoting, and compensating," *Brockman*, 217 F. App'x at 205–06, that would be sufficient to form the basis of a disparate treatment claim.[17] *See also Munday v. Waste Management of N. Am., Inc.*, 126 F.3d 239, 243 (4th Cir. 1997) (holding that there was no adverse employment action where an employee was given less preferable work assignments, excluded from meetings, and ignored). Because Plaintiff cannot establish that she suffered an adverse employment action other than her termination, the claim is duplicative of her discriminatory termination claim and ODU is entitled to judgment as a matter of law on Plaintiff's disparate treatment claim.

### E. Retaliation

A plaintiff can prove illegal retaliation under Title VII or Section 1981 if she shows that "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Strothers*,

---

[17]     Moreover, although there may be disputes of fact regarding Plaintiff's treatment by her colleagues, those disputes are immaterial because, even when viewed in the light most favorable to Plaintiff, such treatment does not meet the "higher burden" required for adverse employment action in a disparate treatment claim. *Brockman*, 217 F. App'x at 205.

895 F.3d at 327. The parties agree that Plaintiff suffered an adverse action when her contract was not renewed. The Court must determine whether Plaintiff has met the first and third elements.

1.  Protected Activity

Plaintiff points to five potential protected activities: first, her complaints about *American Dreamer* to Brandon and Genard; second, Plaintiff's "push back" to Brandon when he questioned three African American donors Plaintiff planned to invite to an ODU football game; third, Plaintiff's July 30, 2019 email to Henley (copying Genard, Gershman, and Stooks) regarding her contact with donors; fourth, Plaintiff's August 1, 2019 email to Genard regarding gift credit and disputes with Henley; and fifth, Plaintiff's August 6, 2019 meeting with HR. Mem. in Opp'n 14–15, ECF No. 17.

Protected activities are categorized as either participation or opposition. *Laughlin v. Metro Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII" or "for opposing discriminatory practices in the workplace." *Id.* (citing 42 U.S.C. § 2000e-3(a)). Opposition conduct includes using "informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (citing *Laughlin*, 149 F.3d at 259). None of the activities Plaintiff describes occurred during an ongoing investigation or proceeding; thus, the Court evaluates whether these activities constitute opposition conduct.

An employee's opposition conduct can be protected activity even if the activity the employee opposes is not unlawful under Title VII. "[C]omplaining employees are protected if, at the time of their complaint, they 'have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.'" *Strothers*, 895 F.3d at

327 (quoting *Boyer-Liberto*, 786 F.3d at 282). However, to succeed on a claim for retaliation, an employee must complain of discrimination that could potentially be prohibited by Title VII; it is not enough to complain "about unfair treatment generally." *Conyers v. Virginia Hous. Dev. Auth.*, 927 F. Supp 2d 285, 295 (E.D. Va. 2013) (collecting cases and citing *Monk v. Potter*, 723 F. Supp. 860, 880 (E.D. Va. 2010) ("Title VII does not prohibit retaliation against employees who do not allege unlawful discrimination.")); *see also Salley v. Sch. Bd. of Amelia Cnty.*, No. 3:20cv939, 2021 WL 5760893, at *21 (E.D. Va. Dec. 3, 2021) ("[Section] 1981 covers claims for retaliation, but only 'for complaining about racial discrimination.'") (quoting *Liegeois v. Johns Hopkins Med.*, No. 15-2919, 2016 WL 1625121, at *6 (D. Md. 2016)).

The Court will first consider Plaintiff's objections to *American Dreamer*, her "push back" to Brandon regarding the African American donors she invited to an ODU football game, and Plaintiff's July 30 and August 1, 2019 emails regarding Henley. The Court readily concludes that none of these activities constitute protected activity because they do not involve complaints about race. As to Plaintiff's misgivings about *American Dreamer*, her opinions were respected, Brandon understood Plaintiff's discomfort, and Genard attended the premiere on ODU's behalf. Regarding potential donors, Plaintiff explained her rationale for inviting the three donors to the game and Brandon accepted Plaintiff's reasoning. Brandon had also questioned invitees proposed by other employees in the past and did not question other African American donors on Plaintiff's list.

Plaintiff's emails similarly do not constitute protected activity. In her July 30, 2019 email to Henley, Plaintiff expresses that she was "disappointed" by seemingly unfair treatment, but nothing in the email suggests that Plaintiff had an "objectively reasonable belief" that the reason for the differential treatment was unlawful. Henley Emails, ECF No. 17-13. Likewise, in her August 1, 2019 email to Genard, Plaintiff reports various serious concerns, including that

colleagues were "gang[ing] up against [her]" and that she did not "feel [she had] an advocate or a support system," but never connects those concerns to potential race discrimination. Genard Email, ECF No. 15-18. While Plaintiff correctly notes that complaints need not use "magic words" to constitute protected activity, *Okoli v. City of Baltimore*, 648 F.3d 216, 224 n.8 (4th Cir. 2011), "Title VII requires that employees provide some kind of notice to their employer that they are complaining about prohibited practices covered by the statute." *Mixon v. Charlotte-Mecklenburg Sch.*, No. 3:11cv228, 2011 WL 5075808, at *6 (W.D.N.C. Aug. 5, 2011), *report and recommendation adopted*, 2011 WL 5075622 (W.D.N.C. Oct. 26, 2011), *aff'd*, 473 F. App'x 271 (4th Cir. 2012). In these contacts with ODU, Plaintiff never said that she felt she was being poorly treated and discriminated against because of her race.

Accordingly, Plaintiff has failed to establish she engaged in protected activities regarding her objections to *American Dreamer*, her "push back" to Brandon regarding potential donors, or her July 30 and August 1, 2019 emails.

Plaintiff's August 2019 contacts with HR present a more difficult question. Plaintiff proves that she had several contacts with HR, including emails, a meeting, and follow up telephone calls with an HR Consultant, the HR Assistant Vice President, and the HR Vice President. Plaintiff gave HR a copy of the August 1, 2019 email to Genard outlining her concerns. DSUF ¶ 37; Genard Email, ECF No. 15-18. Yet throughout those communications, Plaintiff never said that she felt she was being poorly treated and discriminated against because of her race. In her deposition, Plaintiff agreed that she never told HR she attributed the treatment she complained of to her race, and that the first time HR would have realized she was alleging race discrimination was after her termination in November 2019. Plaintiff Dep. 88:13–89:2, ECF No. 22-5. On the other hand, Plaintiff was the only African American Major Gifts Officer in the Office of Development in

Norfolk and complained that she was "being singled out" and "bullied and harassed and mistreated." Plaintiff Dep. 48:21–49:8, ECF No. 15-7. The HR Assistant VP related that when she asked Plaintiff why she felt she was being treated differently, Plaintiff responded, "Why do you think?" Whitehead Dep. 36:14–15, ECF No. 17-3.

### 2.  Causal Connection

Even assuming Plaintiff engaged in protected activity, she must show a causal link between the protected activity and her termination to satisfy the third element of and succeed on her retaliation claim. A plaintiff may establish a causal connection for purposes of her retaliation claim: (1) by offering facts that suggest that the adverse action occurred because of the protected activity, or (2) by establishing that the adverse act bears sufficient temporal proximity to the protected activity. *Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 123 (4th Cir. 2021) (citations omitted). Additionally, to establish causation, a plaintiff must show that her employer knew about the protected activity and took adverse employment action against her because of the protected activity. *Id.* at 124. "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the *prima facie* case." *Id.* (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

While Plaintiff insists that "it is clear that Stooks was apprised of Plaintiff's complaints to HR," the record shows the opposite. *See infra* n.6. HR did not tell Stooks or any other decisionmaker that Plaintiff had complained about differential treatment. Mem in Opp'n 8, ECF No. 17; Whitehead Dep. 63:21–64;3, ECF No. 17-3; Stooks Decl. ¶ 3, ECF No. 22-2. Plaintiff cannot show that any of the individuals involved in the decision to eliminate her position knew she had complained to HR, let alone that those individuals terminated Plaintiff because of her HR

complaint. *Roberts*, 998 F.3d at 124 ("To satisfy the third element, the employer must have taken the adverse employment action *because* the plaintiff engaged in a protected activity.") (quoting *Dowe*, 145 F.3d at 657). Thus, even assuming Plaintiff's HR complaint constituted protected activity, Plaintiff cannot establish a causal connection between her protected activity and her termination, and she cannot state a *prima facie* claim for retaliation as a result.[18]

### 3. Pretext

Further, even if Plaintiff could establish a *prima facie* case of retaliation, ODU has presented a legitimate, non-discriminatory reason for terminating Plaintiff, namely, to eliminate her position to reorganize the Office of Development and create the Philanthropy Director position. *See Jones v. Lowe's Companies, Inc.*, 845 F. App'x 205, 213 (4th Cir. 2021) (reviewing the *McDonnell Douglas* framework). ODU met its burden of production, and the burden shifts to Plaintiff "to prove by a preponderance of the evidence that ODU's stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Id.* (citing *Guessous*, 828 F.3d at 216). If Plaintiff is unable "to present sufficient evidence to show that the employer's proffered reason is unworthy of credence or that a racially discriminatory reason more likely motivated the decision," summary judgment is appropriate. *Id.* at 214 (citing *Price v. Thompson*, 380 F.3d 209, 217 (4th Cir. 2004)).

---

[18]     The Court need not consider the temporal proximity of Plaintiff's termination to her alleged protected activity given that Plaintiff cannot establish a *prima facie* claim for retaliation. But even assuming a *prima facie* retaliation claim, the length of time between Plaintiff's HR contacts in August 2019 and her termination on November 11, 2019, does not suggest a causal connection. *See Roberts*, 998 F.3d at 124 (noting that the Fourth Circuit has "found that, absent other evidence of a causal relationship, a lapse of two months between the protected activity and the adverse action is sufficiently long so as to weaken significantly the inference of causation") (internal quotations and citation omitted).

In asserting that she has met her burden on pretext, Plaintiff states only the following: "Because there are numerous material facts in dispute concerning ODU's purported justification for Plaintiff's termination . . . summary judgment is inappropriate." Mem. in Opp'n at 17, ECF No. 17. Although Plaintiff does not specifically identify these material facts, Plaintiff does refer to eleven paragraphs of Plaintiff's "Disputed Material Facts" and six paragraphs of Plaintiff's "Statement of Undisputed Material Facts." The Court will consider the relevant evidence.

As an initial matter, much of the "facts" proffered by Plaintiff is unsupported speculation or argument. For example, Plaintiff asserts that "[t]he evidence adduced to date indicates that [the statement that ODU was 'moving in another direction'] was made as pretext for firing the Plaintiff," but does not cite any evidence. PDMF ¶ 2. Relatedly, Plaintiff asserts that ODU "regularly uses 'non-renewal' as a method for getting rid of employees," but does not explain why, even if this fact is true, it has any bearing on whether ODU's articulated reason for terminating her was pretextual. *Id.* Elsewhere, Plaintiff nitpicks at certain ambiguities in the record that have no bearing on the issue of pretext. For example, Plaintiff argues that "it was not apparent that ODU would need to help raise funds for the [Museum] in early or mid-2019" and that ODU "lists various reasons why reclassifying the Plaintiff's position to include the [Museum] made sense but fails to note when these issues were considered." *Id.* ¶¶ 4, 8. Plaintiff's quibbles with the record are not evidence of pretext. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Thomas v. City of Annapolis*, 851 F. App'x 341, 351 (4th Cir. 2021) (cleaned up); *see also Dawson v. Washington Gas Light Co.*, No. 19-2127, 2021 WL 2935326, at *7 (4th Cir. July 13, 2021) (plaintiff failed to raise genuine disputes of material fact as to pretext

where cited evidence was "conclusory and . . . not significantly probative to the allegations at issue").

Plaintiff cites to only one potential item of evidence to meet her burden on pretext: a handwritten note made by her immediate supervisor, Gershman, which "indicate[s] that she considered two alternatives for terminating the Plaintiff's employment." PDMF ¶ 2; Gershman Note, ECF 17-2. Although Plaintiff does not explicitly argue as much, the Court infers that Plaintiff seeks to argue that these notes reflect that ODU's motivation was to fire Plaintiff (presumably because of her race) rather than to eliminate Plaintiff's position. However, neither the content of the note itself nor the relevant testimony supports that conclusion. At the top, the note indicates "2 routes for non-renewal," and then lists both options: "(1) performance" and "(2) non-renewal". Gershman Note, ECF 17-2. Under the non-renewal option, the following appears: "employee less than 2 years – 'we['re] going in a different direction.'" *Id.* When asked about the note, Gershman testified that she "believe[d] [the note] was just a general explanation of here's how that . . . works" and that when she made the note, she "was new to the university" and "had no idea how any of that, you know, worked. So I think this was just a general explanation." Gershman Dep. 57:20–22; 58:22–25, ECF No. 22-7. Neither the note nor the testimony about it suggests that ODU's true reason for terminating Plaintiff was discriminatory or retaliatory, and it is insufficient, even viewed in the light most favorable to Plaintiff, to show that ODU's proffered reason is "unworthy of credence or that a racially discriminatory reason more likely motivated the decision." *Jones*, 845 F. App'x at 214.

The remaining evidence supports ODU's proffered non-discriminatory explanation, which has remained consistent and is supported by multiple witnesses who testified to the same background, general timeline, and rationale for the decision to eliminate Plaintiff's position. *See*

*id.* The burden is on Plaintiff to show "that race was a but-for cause of [her] firing" and that "racial considerations *caused* the adverse decision." *Id.* at 215 (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)). The Court cannot assume that because Plaintiff was the only African American Major Gifts Officer on campus and was terminated, her termination must have been because of her race. Plaintiff must offer evidence to satisfy her burden to show that ODU's stated reason for terminating her constitutes pretext, even assuming a *prima facie* case of retaliation. Plaintiff fails to do so, and the Court must therefore grant ODU's motion for summary judgment on Plaintiff's retaliation claims.

### IV.  CONCLUSION

For the foregoing reasons, the Court will grant ODU's Motion for Summary Judgment, ECF No. 14, on Count I (racial discrimination/harassment under Title VII), Count II (retaliation under Title VII), Count III (racial discrimination under Section 1981), and Count IV (retaliation under Section 1981). To the extent that Plaintiff raises a disparate treatment claim, the Court also concludes that summary judgment in favor of ODU is appropriate and will grant ODU's Motion as to that claim.

The Court will deny ODU's request for a hearing, ECF No. 23, and will deny ODU's Omnibus Motions in Limine Nos. 1–3, ECF No. 24, as moot.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

/s/

Elizabeth W. Hanes
United States District Judge

Norfolk, Virginia Date:
February 28, 2023